**Morris A. KENT, Jr., Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 17935.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 17, 1963.

Decided Oct. 26, 1964.

Order Jan. 22, 1965.

Certiorari Granted May 3, 1965.

See 85 S.Ct. 1450.

Mr. Myron G. Ehrlich (appointed by this court), Washington, D. C., for appellant.

Mr. David C. Acheson, U. S. Atty., with whom Messrs. Frank Q. Nebeker, Joseph A. Lowther and Max Frescoln, Asst. U. S. Attys., were on the brief, for appellee.

Mr. Gerald A. Messerman, Asst. U. S. Atty., also entered an appearance for appellee.

Before WASHINGTON, DANAHER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

In respect of incidents involving three separate persons at three different locations within a period of about 90 days, appellant was indicted on three counts of housebreaking, three counts of robbery, and two counts of rape. After a trial at which the principal defense was insanity, a jury found appellant guilty under the first two categories, but not guilty by reason of insanity as to the rape charges. St. Elizabeths Hospital was recommended by the court as the place of confinement until such time as he was found sane, but the court also directed that credit be given on the prison terms, imposed as a result of the guilty verdicts, for all time spent in that institution.

Some of the issues raised on this appeal focus upon asserted errors in the trial in the District Court. Others, however, are cast in terms of a denial of jurisdiction in that court. The latter derive mainly from the circumstances that appellant was a juvenile as to whom the Juvenile Court had waived its jurisdiction. The jurisdictional questions, thus, have the first claim upon our attention.

I

At the time of his arrest, appellant was sixteen years old and, for the preceding two years, had been under the custody of the Juvenile Court as a probationer. The crimes for which he was indicted occurred during the last three months of this period. Shortly after his arrest, appellant's mother, accompanied by his attorney, had an interview with the Social Service Director of the Juvenile Court for the purpose of making representations against any possible waiver by the Juvenile Court of its jurisdiction. The Director is characterized as having been pessimistic in attitude towards the likelihood that there would be no waiver. Appellant's counsel was told that he could attempt to see the judge who would make the decision, but that success in obtaining an interview was unlikely. In any event, the Director undertook to see to it that the decision was delayed a few days to permit counsel to submit to the court any memoranda or other material that he wished. Counsel apparently did not press the matter of a personal interview, but did submit a memorandum on the question of waiver, together with a report from a psychiatrist relating to appellant's mental condition. After the receipt of these submissions by the Juvenile Court, it entered an order reciting that, "after full investigation," [1] jurisdiction was waived over fourteen enumerated felony offenses, and appellant was held for trial under the regular procedures of the District Court. Eight of these offenses were the subject of the indictment returned about two weeks thereafter.

By a motion filed in the District Court to dismiss this indictment, appellant attacked the propriety of the waiver and, thus, the jurisdiction of the District Court. The grounds of this attack were said to be, first, that the waiver fell outside the authority conferred by statute because it was not preceded by a "full investigation"; and, second, that the waiver followed upon events which denied appellant due process of law under the Fifth Amendment and effective assistance of counsel under the Sixth. In addition, appellant now argues that the waiver in this case was erroneous as a

1. The phrase is from 11 D.C.Code § 1553, which in its entirety reads as follows:
"When a child 16 years of age or over is charged with an offense which if committed by a person 18 years of age or over is a felony, or when a child under 18 years of age is charged with an offense which if committed by a person 18 years of age or over is punishable by death or life imprisonment, a judge may, after full investigation, waive jurisdiction and order the child held for trial under the regular procedure of the court which would have jurisdiction of the offense if committed by a person 18 years of age or over; or the other court may exercise the powers conferred upon the Juvenile Court by this chapter and subchapter I of chapter 23 of Title 16 in conducting and disposing of such cases."

matter of law because in disregard of the *parens patriae* philosophy of the Juvenile Court system and in disregard of the Juvenile Court's own standards governing waiver.[2] The motion, filed November 16, 1961, prayed the District Court itself to assume jurisdiction of a Juvenile Court, as an alternative to the requested remand.

Factual support for the grounds advanced in the motion was sought to be provided by a number of affidavits, which may be identified and summarized as follows:

(1) An affidavit by appellant's father to the effect that, although possessed of information with respect to appellant's mental health, affiant was never approached by officials of the Juvenile Court.

(2) An affidavit by appellant's school principal stating that it was "apparent" to the school officials that appellant presented serious behavior problems and needed psychological help and that neither affiant nor any member of his staff was ever interviewed by the Juvenile Court about appellant's difficulties.

(3) An affidavit by appellant's mother that she had been interviewed only "superficially" by Juvenile Court officials prior to appellant's last arrest, and only "equally superficially" after that arrest; and that affiant was not afforded an opportunity in these interviews to provide information concerning appellant's mental condition, which affiant believed to be deficient because of her observations of abnormal conduct on his part over the years.

(4) An affidavit by a psychiatrist to the effect that he transmitted to the Juvenile Court prior to waiver his opinion that appellant was a "victim of severe psycho-pathology"; that a complete investigation of the psychological and social factors of his case was impossible without placing him "in a hospital situation for psychiatric observation"; and that the Juvenile Court had not responded in any way to this expression of opinion.

(5) An affidavit by appellant's counsel, describing the interview he had had, in company with appellant's mother, with the Social Service Director of the Juvenile Court, and his action, in consequence thereof, in submitting a memorandum and a psychiatric report to that court prior to waiver. This affidavit further asserted that appellant had been intensively interrogated by the police after his arrest and prior to the waiver; and that affiant had filed a written objection to this interrogation, which objection elicited no response of any kind. Finally, affiant stated that he had also filed a motion with the Juvenile Court, asking that appellant be hospitalized, that his social service file be disclosed to affiant, and that a hearing be held prior to any decision to waive. In respect of the second of these requests, affiant said that he represented to the court his inability to render effective assistance as counsel without being able to submit the social service records to "appropriate experts" available to him, for study by such experts. Affiant asserted that no formal action was taken on this motion, nor was any additional information requested by the court in response to the memorandum and psychiatric information submitted on appellant's behalf.[3]

---

2. It would appear that this ground for dismissal was not presented to the lower court. However, since the point is so closely connected with the other issues, we will treat it on its merits.

3. A sixth affidavit was also filed, made by what appears to have been a legal as-sociate of appellant's counsel. Affiant had been present at the interview with the Social Service Director, and he confirms the opportunity provided by the latter for material to be submitted to the judge before the waiver decision was made. The rest of the affidavit repeats the impression of skepticism on the Di-

Not long prior to the filing of this motion, appellant had moved the District Court to commit him to the District of Columbia General Hospital for a mental examination, and this request had been granted. When the Government took exception to a finding by this institution that appellant was not competent to stand trial, the District Court, on its own motion and with the express consent of appellant's counsel, directed that appellant be examined further at St. Elizabeths Hospital. The superintendent of that institution certified in due course that appellant was competent for purposes of trial; and appellant asked that the issue be set down for hearing.

■ After a substantial delay caused by the pendency of appellant's other litigation,[4] the District Court addressed itself on February 8, 1963 to the motion to dismiss. Before it at that time were the motion and accompanying affidavits submitted by appellant, and the Juvenile Court records, including the social records, relating to appellant. The District Court file also included, of course, the two psychiatric studies made in consequence of that court's two earlier commitments of appellant for mental examination. The District Court denied the motion, as well as the alternative request that it proceed as a Juvenile Court. In so doing, the District Court did not, in our view, commit error.

rector's part as to the likelihood that representations with respect to appellant's mental condition would affect the result.

4. Kent v. Reid, 114 U.S.App.D.C. 330, 316 F.2d 331 (1963). Appellant had first challenged the waiver order, on the ground of inadequate investigation, by *habeas corpus* in the District Court, and also by a direct appeal to the District of Columbia Court of Appeals. We ruled that, as to the latter, the order was not final and appealable; and, as to the former, that *habeas corpus* was not available inasmuch as the question could be raised in the criminal proceeding by motion to dismiss the indictment.

5. "An offense falling within the statutory limitations (set forth above) will be waived if it has prosecutive merit and if it is heinous or of an aggravated

## II

■ We cannot say, from an examination of the record before us, that the Juvenile Court's waiver in this case was wholly at odds with the *parens patriae* philosophy of the statutory scheme under which that Court functions. For the system to operate as intended, the Court must have a wide discretion in both the formulation and the application of a waiver policy. The reviewing function of the District Court and of this court *vis-a-vis* the merits of a waiver decision by the Juvenile Court must necessarily reside within narrow limits and depend, for its affirmative exercise, upon the demonstrable existence of arbitrariness or capriciousness.

■ Congress specifically provided that the Juvenile Court might, in certain cases, waive its jurisdiction. It left the criteria for decision to be formulated by the agency it obviously deemed the best-informed and best-suited for this task, *i. e.*, the Juvenile Court. On November 30, 1959, the Judge of that court issued Policy Memorandum No. 7, which, after reciting the principle of the desirability of public knowledge of the considerations germane to the issue of waiver and the fact of wide-spread prior consultations with interested groups on the subject of what those considerations should be, proceeded as set forth in the margin.[5]

character, or—even though less serious— if it represents a pattern of repeated offenses which indicate that the juvenile may be beyond rehabilitation under Juvenile Court procedures, or if the public needs the protection afforded by such action.

The determinative factors which will be considered by the Judge in deciding whether the Juvenile Court's jurisdiction over such offenses will be waived are the following:

1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

3. Whether the alleged offense was against persons or against property,

This memorandum was in effect at the time of the proceedings under attack here. The standards it identifies and enumerates do not impress us as arbitrary or capricious on their face, nor as likely to take the court applying them beyond the range of Congressional purpose. They are presumably neither static nor exhaustive, and, in accordance with the spirit of the Juvenile Court system, will be continuously shaped by, and applied in the light of, the accumulating experience and expertise of this specialized tribunal.

What, then, is our warrant for saying that the Juvenile Court in this instance acted beyond its competence and in a manner requiring our corrective intervention? We do not, of course, have in this record a specification by the Juvenile Court Judge of precisely why he concluded to waive jurisdiction.[6] But neither may one infer from what is before us that his reasons fell outside the penumbra of Policy Memorandum No. 7, or that he chose to treat this case in a manner wholly different from that contemplated by such memorandum. Applying the same criteria—freighted as they are with highly subjective elements—we perhaps might have reached a different result. But the essence of the juvenile court system is subjective judgment—the skill and experience of the specialist judge brought to bear upon young people in trouble. The revision of that trained judgment in a particular case by a non-specialist tribunal is a venture not to be undertaken lightly and without patent justification.

Appellant urges upon us both substantive and procedural objections to the decision by the Juvenile Court to waive jurisdiction over him. Those falling into the first category appear to be compounded of two elements, the first of which is the assertion that at least some of the standards set forth in Policy Memorandum No. 7 are invalid on their faces, i. e., the seriousness of the crime and the prosecutive merit of the complaint. We, of course, do not know the precise degree, if any, which either or both of these factors entered into the waiver

---

greater weight being given to offenses against persons especially if personal injury resulted.

4. The prosecutive merit of the complaint, i. e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U. S. District Court for the District of Columbia.

6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts in other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.

It will be the responsibility of any officer of the Court's staff assigned to make the investigation of any complaint in which waiver of jurisdiction is being considered to develop fully all available information which may bear upon the criteria and factors set forth above. Although not all such factors will be involved in an individual case, the Judge will consider the relevant factors in a specific case before reaching a conclusion to waive juvenile jurisdiction and transfer the case to the U. S. District Court for the District of Columbia for trial under the adult procedures of that Court."

6. No opinion accompanied the decision. Although none is required by the statute, a useful purpose might be served in some cases at least by a discussion of the reasons motivating the determination. Unaided by such a discussion, our task remains the one of weighing the decision in the light of what the record discloses.

determination here, but we are not prepared to say that the bare possibility that they were among the considerations taken into account invalidates the determination.[7] The other basis of the substantive attack seems to be that, because the Juvenile Court was on notice of the possible presence of mental illness and had allegedly neglected that aspect of appellant's situation during the two years of wardship preceding the waiver, the determination to waive was necessarily arbitrary to the point of invalidity.

 The mental condition of a juvenile is obviously a relevant factor within the meaning of Policy Memorandum No. 7. We assume that the Juvenile Court here was well aware that there might be a question in appellant's case as to whether his mental condition justified the imposition of criminal responsibility upon him. But we do not consider that the Juvenile Court either can or must finally and definitively resolve this issue as a pre-condition to a valid waiver. Waiver does not fix criminal responsibility. As in this case, it simply leaves that to the tribunal normally charged with doing so—the District Court. It is by no means clear, as appellant seems contrarily to assume, that the facilities presently available to the Juvenile Court for the diagnosis and treatment of mental disease are as adequate as they should be; or that, indeed, they approximate those serving the criminal law system. A Juvenile Court judge, confronted with

the possibility of mental disease, is hardly disabled from waiving solely by a concern that the relationship of that possibility to criminal responsibility may not be properly established in the District Court or, if no responsibility for this reason is ultimately found, that the defendant cannot thereafter be accorded proper treatment. There is, of course, the possibility that the jury would find the defendant, in a case such as this, responsible for at least some of his acts despite significant evidence of mental disease. However, waiver policy cannot rest upon the contingencies of the jury system, nor is the reasonableness of a particular decision to waive to be weighed with the hindsight of what has eventuated with respect to the imposition of criminal responsibility. In any event, the District Court is equipped with both the authority and the facilities to explore the mental difficulties of defendants and to effect hospitalization in proper cases. We pointed this out expressly in appellant's earlier appeal, where we said that "it seems unnecessary to note that the appellant will have in the District Court all the rights in relation to his alleged psychiatric problems that he would have in the Juvenile Court." Kent v. Reid, 114 U.S.App.D.C. at 333, 316 F.2d at 334. Indeed, it can be urged that the District Court's range of opportunity in this respect exceeds that of the Juvenile Court, especially considering the limited time available for cure and rehabilitation under a Juvenile Court commitment.[8]

---

7. It is also argued that the Juvenile Court judge must have erred in his appraisal of "the sophistication and maturity" of appellant. This, of course, is but one of the standards contained in Policy Memorandum No. 7, and we do not know the exact role it played in the decision. It is, in any event, one of the more subjective of the standards, and corresponding deference is due the Juvenile Court Judge's judgment on this score.

8. The jurisdiction of the Juvenile Court ceases when the youth reaches the age of 21. 11 D.C.Code § 1551. In fact Congress seems to have had a case such as this in mind when it amended the waiver provision, in 1947, to provide

that even children under sixteen years of age could be waived if the crime with which they were charged would be punishable by death or life imprisonment. Congress seems to have been concerned that juveniles, guilty of serious offenses such as rape, might after reaching the age of twenty-one still remain "a hazard to the community or [a] handicap [to] law enforcement." It was thought that the "public interest and safety may demand that these offenders be detained and treated for extended periods * * *." H.R.Rep. No. 242, 80th Cong., 1st Sess. 2 (1947). The report went on to state that

"certain of these offenders who present deep-seated problems must be provided

Thus, to the extent we are being asked to reverse the Juvenile Court's determination on its merits, we find no warrant for interference.

### III

■■ Appellant's argument that the waiver was not preceded by the "full investigation" contemplated by the statute is of a different order; and there can, of course, be no question that the Juvenile Court, like any other, is subject to correction for failure to observe the procedural commands of the statute under which it functions. Here, again, however, discretion comes into play. "Full investigation" is not a precise specification, and its content must be filled out in the first instance by the administering agency. As we said in Wilhite v. United States,[9] under the governing statute "the Juvenile Court conducts such investigation as is needed to satisfy that court as to what action should be taken on the question of waiver." Nothing contained in the affidavits compelled the District Court to conclude that such an investigation had not occurred here.

We note in this regard that this was not a case of a first encounter between appellant and the Juvenile Court and its staff. At the time of his arrest for the crimes involved here, he was a ward of the Court and had been for two years. It is not paltering with reality to infer that the Court knew a great deal about him; and that its decision on waiver was informed by prior experience with, and observation of, appellant himself. This circumstance contributes significantly to the conclusion that the statutory admonition of "full investigation" was here obeyed, and that the allegations of the affidavits raise no substantial issue to the contrary.[10] Moreover, the record in that court contained a report by the professional staff of the court, pointing, among other things, to the strong possibility of mental disease. In addition there was the report of two psychiatrists and a psychologist, chosen by appellant's mother and his counsel, who were permitted to examine appellant, submitted with a memorandum by counsel fully covering the relevant facts. Appellant's assertion of the inadequacy of the investigation centers upon the issue of appellant's mental condition. To accept such an assertion we would have to assume that the Juvenile Court disregarded all of this material in reaching its decision. We are not prepared to make that assumption.

In light of all this evidence before the Juvenile Court, we cannot but conclude that the additional material, if any, that might have been garnered by interviews with the father and school principal would have added little, if anything, to that court's knowledge. The same can

with long-term institutional care, and must not be returned to the community while there is any danger of their repeating their offenses. The proposed amendment permits the juvenile court to determine which children will be amenable to the treatment resources at its disposal and to transfer its jurisdiction in cases demanding such action." *Id.*

9. 108 U.S.App.D.C. 279, 280, 281 F.2d 642, 643 (1960).

10. In holding, in Kent v. Reid, *supra*, that the question of the adequacy of the investigation could be explored in the District Court through such proceedings as might be necessary in the light of the allegations made, this court added this comment, which acquires significance from the fact that the allegations now made

were before the court then (114 U.S. App.D.C. at 332 n. 6, 316 F.2d at 333 n. 6):

"We leave open the question whether the allegations made here would be sufficient. We note, however, that they do not take account of the fact that the appellant had been in the custody of the Juvenile Court on probation for two years preceding his arrest on September 5, 1961, during which reports from social workers and probation officers must have been received and significant and highly material facts must have been developed. *Cf.* United States v. Anonymous, 176 F.Supp. 325, 326 (D.D.C.1959), approving as sufficient the investigation conducted where the boy involved had 'no past criminal or juvenile record of any sort.' * * *"

be said for the additional evidence which the mother might have furnished.[11] If there was error in not seeking out this additional information, it was cured before waiver by the memorandum and reports submitted by appellant's counsel.

Thus, on this record it appears to us that the Juvenile Court had sufficient evidence to make an informed, intelligent decision. Since this is the purpose of the statutory requirement of "full investigation," we find no denial to appellant of the processes guaranteed him by the Congress.

## IV

■■ In turning to the constitutional infirmities asserted to inhere in the Juvenile Court's waiver in this case, we note at the outset that the constitution does not specifically provide that a juvenile must be tried in a juvenile court. The "right" to be tried in a juvenile court is of statutory origin and is limited by the express provision allowing discretionary waiver.[12] We are also reminded that this court has said of juvenile proceedings that the "constitutional safeguards vouchsafed a juvenile in such proceedings are determined from the requirements of due process and fair treatment, and not by the direct application of the clauses of the Constitution which in terms apply to criminal cases." Pee v. United States, 107 U.S.App.D.C. 47, 50, 274 F.2d 556, 559 (1959). See Shioutakon v. District of Columbia, 98 U.S. App.D.C. 371, 236 F.2d 666, 60 A.L.R.2d 686 (1956). We take it that "due proc-

ess" and "fair treatment" in this context mean that the juvenile shall be dealt with in a reasonable and decent manner which gives due regard to his claims upon society as well as to the latter's claims upon him. We measure the contentions made here by that standard.

The facts underlying these contentions are taken to be those asserted in the affidavit of appellant's counsel, referred to above. It is there said that appellant was arrested on the afternoon of September 5, and that he was extensively questioned that day and the next by the police without having been advised of his right to remain silent or to retain counsel. Throughout the police interrogation, appellant appears to have remained in the custody of the Juvenile Court authorities, and it is explicitly stated that an official of that court interviewed him during this period. It appears that counsel was retained early in the afternoon of September 6, and it was that same afternoon that counsel and appellant's mother met with the Social Service Director of the Juvenile Court. It is not alleged that counsel was denied access to appellant, and, indeed, it is positively asserted that counsel was able to arrange for examinations of appellant in the Receiving Home by two psychiatrists and one psychologist of counsel's choice.

■■ We do not find in all this any treatment of appellant so unfair in nature as to constitute a denial of his right to due process of law.[13] A juvenile

---

11. The mother concedes that she had been interviewed at least twice, but she characterizes these interviews as "superficial," because, apparently, she was not given an opportunity to provide information about appellant's mental state. How or why she was foreclosed in this respect does not appear from her affidavit.

12. Waiver is, generally, the exceptional course, however. See Harling v. United States, 111 U.S.App.D.C. 174, 177–178, 295 F.2d 161, 164–165 (1961).

13. Recently, in Edwards v. United States, 117 U.S.App.D.C. 383, 384, 330 F.2d 849, 850 (1964), this court said:

"He [a juvenile] may be held in custody by the juvenile authorities—and is available to investigating officers—for five days before any formal action need be taken. There is no duty to take him before a magistrate, and no responsibility to inform him of his rights. He is not booked. The statutory intent is to establish a non-punitive, non-criminal atmosphere."

Of course the police, upon arresting a juvenile, must place him "in the custody of a probation officer or other person designated by the court, or * * * [take him] immediately to the court or to a place of detention provided by the

in the custody of the Juvenile Court is not immune from questioning by investigating officers, especially in view of the very real limitations which we have recognized as existing upon the utilization of the results of such interrogation in any subsequent criminal proceeding against him. Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (1961). It is, of course, conceivable that an interrogation could be carried on under such rigorous conditions that, regardless of all else, our concepts of decent treatment might be offended;[14] but we do not find any such showing made by the affidavits here.

◼ Neither do we find a deprivation of constitutional right in the failure of the Juvenile Court to accord appellant precisely the course of action in respect of his mental condition requested by his counsel. A request was made that appellant be hospitalized in District of Columbia General Hospital for a protracted examination. As noted above, the Juvenile Court did afford counsel a full opportunity to have appellant examined by his own experts, and subsequently received a full report of this examination. The Juvenile Court may well have recognized that mental illness might ultimately be a major problem in appellant's case, but, as stated earlier, this would not necessarily vitiate the soundness of a decision to waive jurisdiction. The action of that court was not unfair under the circumstances.[15]

◼ The claim that there was a denial of effective assistance of counsel rests principally upon counsel's assertion that he was denied an opportunity to examine the social records of the Juvenile Court relating to appellant and, in particular, to have them studied by the experts on mental illness which counsel had retained. Because these records were

Board of Commissioners of the District of Columbia * * * and the officer taking him shall immediately notify the court and shall file a petition when directed to do so by the court." 16 D.C. Code § 2306(a). It is not clear on this record whether this statute was complied with. If not, the police acted illegally. However, even assuming that, the sanction to be imposed, if any, would not necessarily be to invalidate all subsequent proceedings. Any evidence obtained during such a detention might be inadmissible, but here that question presents no problem because the trial judge did not permit that evidence to come before the jury. See Harling v. United States, supra.

In the Harling case, at footnote 12, quoting from STANDARDS FOR SPECIALIZED COURTS DEALING WITH CHILDREN (Children's Bureau, Department of Health, Education and Welfare, 1954), at 38–39, we noted that

" 'Because of the child's presumed immaturity, special safeguards should be thrown around a police officer's interview with a child in investigating a delinquent act. * * *

" 'Before being interviewed, the child and his parents should be informed of his right to have legal counsel present and to refuse to answer questions if he should so decide. In cases where waiver is possible, he should also be cautioned that if he answers, his answers may be used not only before the specialized court but possibly in a criminal court. Where a child has been questioned alone by a police officer, without having been given an opportunity to secure the presence of his parents, guardian, or counsel, his statement during such interview should be presumed to have been induced either by the child's immaturity or by the idea that they would be used only in the specialized court and they should, therefore, unless the presumption is overcome, be excluded from admission before a criminal court in which the child may be a defendant.

" 'Whenever possible and especially in the case of young children, no child should be interviewed except in the presence of his parents or guardian. This should always be the policy when a child is being questioned about his participation or when a formal statement concerning the child's participation in the alleged delinquent act is being taken.' "

14. We would then have to face the very difficult question of the sanction to be imposed for such a departure from acceptable standards.

15. Appellant did, of course, eventually receive two protracted mental examinations before going to trial, upon order of the District Court.

available to the judge in making his decision as to waiver, the argument is that counsel could not know how to supplement, explain, or refute the data they contained. But, as we have noted hereinbefore, Juvenile Court proceedings are not trials in the usual sense. That court administers a non-criminal process in the nature of social service work directed to the accommodation of the interests of the juvenile and of society. The social records compiled in the course of a wardship under that jurisdiction have special characteristics which have caused Congress to conclude that they should not, unlike most public records, be ordinarily available for inspection. Congress has distinguished between these particular records, and the records of the Juvenile Court generally.[16] The social records serve a particular, and narrow, function, i. e., as background psychological, sociological and economic data to inform the juvenile authorities on treatment of the child. They are therefore unlike any ordinary judicial records. Their closest analogue in adult proceedings is probably a combination of a probation report and a sentencing report. They would, therefore, be of little or no use to a lawyer in the usual case, except perhaps to do the lawyer's job for him in accumulating background information. We think, at the least, the statute grants the Juvenile Court a discretion in deciding whether to allow counsel to search the social records in advance of waiver. See H.R.Rep. No. 1937, 82d Cong., 2d Sess. (1952).

On this record we cannot say that the court acted unreasonably—to the extent of abusing the discretion reposed in it—

in failing to respond to counsel's request. It appears that his central purpose was to have them examined by psychiatric experts. There is no claim that these experts needed the records in arriving at their diagnosis. The claim is, in essence, that counsel should have the opportunity to challenge them, presumably in a manner akin to cross-examination. This is precisely the kind of adversarial tactics which the system is designed to avoid. Counsel's role is to present to the court anything on behalf of the child which might help the court in arriving at a decision; it is not to denigrate the staff's submissions and recommendations. Counsel was given an opportunity to make a showing to the Juvenile Court on the subject of appellant's mental condition. That opportunity included making appellant available for examination by three experts brought forward by counsel, and delaying the decision on waiver until counsel could submit to the court a report of that examination. We do not think that the opportunity so afforded fell below the level of fair treatment in the constitutional sense because counsel and his experts were not also permitted to comb the social records.

## V

The jurisdiction of the District Court is also challenged on the ground that it failed to make an adequate and fair determination of appellant's mental competency to stand trial. We have detailed hereinabove the successive actions taken by the District Court to have appellant examined at District of Columbia General Hospital and at St.

16. 11 D.C.Code § 1586(a), provides that the general records of the court shall be made available to the juvenile, his family, his lawyer, and others who have a particular interest in the proceedings. 11 D.C.Code § 1586(b) deals specifically with the social records and provides that they "shall be made available by rule or special order of court to such persons, governmental and private agencies, and institutions as have a legitimate interest in the protection, welfare, treatment, and rehabilitation of the child, * * * and to any court before which the child may

appear." The Government argues that, on the face of the statute, the social records are withheld from the child, his parents, and his counsel. It is submitted that disclosure of these records even to these people might be harmful to the child, considering their nature, and, unless there is some compelling reason for disclosure, the statute should be read restrictively. We find for the reasons set out in text that we need not reach this issue. We note only that the statute is ambiguous.

Elizabeths. With reports in hand from these institutions, the District Court granted appellant's motion for a hearing on the issue of competency to stand trial. That hearing was held on March 7, 1963. For the appellant there was offered an affidavit by a psychiatrist who expressed doubt as to appellant's competency,[17] and testimony by his counsel as to difficulties in effective communication between him and his client. Contrarily, two doctors from St. Elizabeths staff testified that, on the basis of examinations of appellant made earlier that day, they believed appellant to be competent to stand trial within the statutory standards. On the basis of this record, we have no justification for regarding the hearing as inadequate or for disturbing the District Court's conclusion on the merits.

Finally, the appellant argues that the District Court erred in not granting the motion to convene itself to hear this case as a juvenile court pursuant to 11 D.C.Code § 1553. As this court has stated before, the District Court may not simply rely upon the waiver of the Juvenile Court to deny such a motion. It must itself "make a clear choice between the procedure and processes which it will apply in the case of a juvenile * * *." Pee v. United States, 107 U.S.App.D.C. 47, 51, 274 F.2d 556, 560 (1959). *Accord,* Franklin v. United States, 117 U.S.App.D.C. 331, 336, 330 F.2d 205, 210 (1964). See also United States v. Anonymous, 176 F.Supp. 325 (D.D.C.1959) (District Court, giving

reasons, convened itself as a juvenile court). In the instant case the District Court did not give the reasons for denying appellant's motion. However, we do not think that such an obligation exists in every case. Again we must look at the record before the District Court and determine whether it acted unreasonably. For the same reasons that the Juvenile Court's waiver was not unreasonable, we find that the denial of this motion was within the province of the District Court's discretion. We are not at liberty to assume that the court below did not give adequate and independent consideration to the papers filed in connection with the motion and the records of the Juvenile Court which were before it.

## VI

The principal error alleged to have been committed in the course of the trial in the District Court is the failure to grant appellant's motion for a judgment of acquittal on all counts on the ground of insanity. On this issue the defense presented a number of witnesses. Four were lay witnesses (appellant's mother, uncle, and two aunts) who testified from personal observation of bizarre or unseemly conduct on appellant's part, suggesting mental instability. Twelve were experts—five psychiatrists (with the testimony of two additional psychiatrists put in the record by stipulation), four psychologists, and one psychiatric social worker—whose testimony in varying degrees pointed towards mental illness and

---

17. It is argued that this hearing was procedurally defective to the point of denying appellant's constitutional rights under the Fifth and Sixth Amendments. This rests upon papers filed with the District Court on November 23, 1962—three months before the competency hearing— which represented that a psychiatrist retained by appellant had not been admitted to the District Jail for the purpose of examining appellant. Neither the facts surrounding this alleged incident, nor the reason given by the jail authorities, appear in the record. No attempt was made to obtain a court order. We note that this asserted denial took place when all proceedings in the District Court were in abeyance because of the

pendency of appellant's other litigation in this court. Those appeals were decided January 22, 1963; and the District Court thereafter went ahead promptly with this proceeding, denying the pending motion to dismiss the indictment on February 8, 1963, and granting the pending motion for a hearing on competency by setting such a hearing on March 7, 1963. It does not appear from the record that, after this proceeding became active again with the disposition of the other appeals, there was any request to examine appellant which was denied. We cannot say that these circumstances establish any constitutional deprivation, destructive of the District Court's jurisdiction.

its causation of the crimes charged. In one instance, at least, these expressions of opinion differentiated between the sex crime of rape, on the one hand, and the property crimes of housebreaking and robbery, on the other. The Government offered as its witnesses on this issue two psychiatrists. One expressed the opinion that there was some mental disease, but that it was not necessarily productive of the robberies and housebreakings.[18] The other psychiatrist was of the opinion that there was no mental disease.

■ This evidence we consider to have been in the precise posture which calls for submission of the issue to the jury. McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962). There was, thus, no error on the part of the District Court in denying the motion for acquittal. The propriety of leaving the question here to the jury is confirmed in some degree, we think, by the selectivity which the jury showed in applying the conflicting evidence to the various crimes, acquitting in the case of rape and convicting of housebreaking and robbery. In the light of the evidence adduced, appellant has, in our view, no cause to complain of either the resort to the jury or the result it reached.

At each of the three locations where the crimes for which appellant was convicted occurred, fingerprints were found after the event. At the trial, the prosecution undertook to prove that these fingerprints coincided with those of appellant. In doing this, the prosecution used prints taken from appellant either the first time he came under the custody of the Juvenile Court or after his arrest for the crimes involved here.[19] It is argued to us that both the taking of these prints and their use in the District Court constituted error rendering the proceedings void from the beginning, or at least requiring a new trial. The argument is made on a statutory level, and also on a constitutional plane, it being asserted that anonymity in all respects is an essential condition to the constitutionality of the Juvenile Court Act.[20]

■ Fingerprinting under the modern view is, however, fundamentally a tool for identification, often employed in law enforcement, but also used for many other purposes. We do not believe that Congress intended to prevent the fingerprinting of persons coming under the custody of the Juvenile Court, any more than it intended to prohibit weighing, measuring, or photographing such per-

18. The doctor's testimony was based upon a hypothetical situation posed by government counsel. The question was, to paraphrase: "Assuming that the robbery occurred before the rape, might that fact lead to a conclusion that the robbery and housebreaking were not a product of the insanity, even if the rape was?" The doctor answered in effect that he considered the insanity primarily sex-oriented. Therefore, even though he considered productivity probable as to the rapes, the robbery offenses were not necessarily a product of the mental disease, if one assumed that they occurred prior to the rapes. One of the defense doctors on cross-examination was posed the same question and answered it similarly. Under the insanity rule of this jurisdiction, the question and answer were highly relevant and completely proper, assuming that there was evidence in the record to support the hypothetical fact situation used, i.e., evidence that the robbery may have been committed before the rape.

Appellant contends that the question was improper because there was no testimony in the record to support the hypothetical situation, and because, contrarily, the question was based upon knowledge of evidence, ruled inadmissible by the trial judge, gained from the appellant during the police questioning before the waiver, citing Harling v. United States, supra. We need not reach the implications of the latter argument since we find evidence in the record to support the question. The complaining witness in at least one, and perhaps both, of the rape charges testified that the robbery occurred first.

19. It could have been either, since it appears that prints were taken each time.

20. Appellant also contends that there was not sufficient evidence of identification by fingerprints to allow the convictions to stand. We find no merit in this argument.

sons. Neither do we believe that the doing of these things undermines the constitutionality of the approach embodied in the Juvenile Court Act or violates any of the rights of the individuals involved.

By the same token, we do not believe that basic identification information collected in this way is wholly unavailable, under the non-disclosure provisions of the Act, for the fundamental purpose it serves, i. e., identification. Fingerprints are a fact, like one's name, one's height, or the color of one's hair. A fact of this kind is not to be suppressed simply because it is recorded in a Juvenile Court file; and we do not believe for a moment that the Congressional objectives underlying the non-disclosure provisions encompass sheer physical facts of this kind. In short, we do not believe the reasoning of the Harling case applies to fingerprints. *Cf.* Edwards v. United States, *supra.*

It is also argued that the fingerprints were taken during a period of illegal detention and, therefore, should have been excluded under Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958) (excluding prints taken after an *unlawful arrest*). As we pointed out above, however, there is no evidence that the prints used were those taken during the purported illegal detention and, in any case, there was no objection to their admission.[21]

A last claim of error is made in respect of the trial court's action in giving a so-called *Allen* charge[22] to the jury before it retired to begin its deliberations. There was no objection to the charge as given, and appellant must,

therefore, establish that it was plain error within the meaning of Rule 52(b), FED.R.CRIM.P. We think it was not; and in this regard we point out that controversy about the *Allen* charge derives from the circumstance of its being given *after* the jury has been deliberating for some time and has failed to agree. We need not now speculate about its coercive effect in that type of case. Here it was given before the jury went out, and as part of the general instructing of the jury. Its coercive impact, if any, in this context surely cannot be equated with the degree of error for which an appellate court will reverse, especially where the allegedly aggrieved party himself failed to register any complaint at the time.

Affirmed.

### WASHINGTON, Circuit Judge.

I concur in the result, and in the opinion of the majority, with the exception of Part II.

I concur in affirmance of the judgment rendered by the District Court, because at least it places appellant in a hospital in the first instance, thus offering the possibility that treatment will improve his mental condition, and because I do not think reversal is required by anything that occurred at appellant's trial, or at the Juvenile Court level. As to the latter, counsel's complaint that the social records were not made available seems insufficient to require reversal here, if only because no adequate showing was made to the Juvenile Court that the records were relevant to the purposes for which counsel requested them.

---

21. Moreover, there is no evidence in the record to support the assertion of an illegal detention. See footnote 12, *supra,* and accompanying text.

22. The charge derives its name from Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), in which the Supreme Court sustained the action of the trial court in recalling the jury after its deliberations had been unproductive and urging upon it the virtues of maximum effort and forbearance to effect an

accommodation of differing views. The designation of "an *Allen* charge" has tended to become an over-simplification since, as might be expected, the express words before the Supreme Court in the *Allen* case have, in the intervening years, been frequently rearranged or altered, with resulting variations in emphasis or impact. The charge appearing in the record before us seems to be one of the milder and more moderately-expressed versions.

As to Part II of the opinion, I think we should emphasize the responsibility of the District Court, and of this court, to provide meaningful consideration to the propriety of the Juvenile Court's waiver of jurisdiction in a particular case, where on proper motion a strong showing is made that the waiver was improvident. And I think we should emphasize also that non-criminal treatment of juveniles should be the rule, and adult criminal treatment of juveniles the exception. See Harling v. United States, 111 U.S. App.D.C. 174, at 177–178, 295 F.2d 161, at 164–165 (1961). But I agree that in the instant case the showing made was not such as to justify us in setting aside the waiver. It is a fair inference from the record before us that one of the reasons why the Juvenile Court waived jurisdiction was because appellant was seriously disturbed and the Juvenile Court lacked facilities adequately to treat him.[1] Under all the circumstances I do not believe the Juvenile Court abused its discretion in waiving jurisdiction. I do not read the majority opinion as going further in its actual holding.

The Juvenile Court confronts a multitude of difficulties in dealing with an aggressive and mentally disturbed youth, over whom the Court must lose its authority when he reaches the age of 21, and for whom in the meantime the Court can provide little in the way of psychiatric care and treatment. The need for improved facilities for such youths is well pointed out in the following article in the Washington Post of September 21, 1964:

### DISTURBED DELINQUENTS LACKING FACILITIES HERE

#### By Dan Morgan

The 17-year-old boy was mentally disturbed and in danger of harming himself or others.

Doctors at D.C. General Hospital felt he could make progress with intensive treatment and supervision in a tightly controlled setting.

Last week, a Juvenile Court judge sadly acknowledged no such facility was available for him in the metropolitan area.

So the judge, Marjorie M. Lawson, did the only thing possible. She temporarily committed him to the District Welfare Department's children center in Laurel, Md., with instructions that the case be reviewed in 90 days to see if a more suitable placement could be found.

In its dealings with mentally disturbed delinquents, the Court almost daily is handcuffed by the inadequacy of present facilities.

"It all comes back to the fact that we don't have a place in the community for this type of child," Judge Lawson said of the 17-year-old.

"I suppose Laurel isn't the answer in about three or four cases a week, but it's the only place at the Court's disposal," said Dr. Laurence L. Frost, until recently the head of the Court's youth guidance clinic.

To fill a desperate need, the children's center—never intended to be a receptacle for disturbed children—has taken on the task of giving psychiatric care to young delinquents as best it can.

It's difficult to treat disturbed youths at an institution designed for normal ones," Welfare Director Donald Brewer admits.

For one thing, the center is not equipped to care for older, aggressive, neurotic youngsters, he said.

More than 80 of the 726 children confined there under court order need some kind of treatment, but

1. See Juvenile Court, Policy Memorandum No. 7, November 30, 1959: "The determinative factors which will be considered by the Judge in deciding whether the Juvenile Court's jurisdiction over such offenses will be waived are the following:
\* \* \*

"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court."

there is only one full-time psychiatrist assigned.

Under this psychiatrist are several part-time psychiatric consultants and five clinical psychologists who work with all the children.

At Maple Glenn, for young delinquent boys, there is a ten-bed cottage occupied by children who cannot function adequately in the other cottages. Cedar Knoll, for older boys, has a maximum security cottage that mixes aggressive delinquents with certain disturbed children.

Considering the limited facilities, rehabilitation often is surprisingly successful, says chief psychiatrist Beryl Kester. Some children with "borderline psychosis" have developed stability after as little as nine months.

But Dr. Kester points out that many of the children probably would have been committed to a residential treatment center if one had been available to the Court.

Winifred Thompson head of the center, says many of the children actually are there "by default."

Dr. Kester has told the Public Health Advisory Council that a residential facility with 240 beds is needed in the area.

Aggressive youngsters pose a special problem, Miss Thompson says. Though it happens rarely, Cedar Knoll has sometimes been unable to cope with a youngster. In that case the Welfare Department has no alternative but to tell the Court the youth is beyond control.

"The Court has to let him go," Miss Thompson said.

### Mingle With Adults

In Washington itself, the only round-the-clock facility for disturbed children is St. Elizabeths Hospital, where they mingle with adult patients.

A youth center is now being developed there for day recreation and schooling for the children.

Even this less-than-ideal setting is unavailable to Juvenile Court, however. It cannot commit children to the Hospital because it is an adult institution.

Some youngsters under Court jurisdiction do get there, though, through a commitment by the Mental Hygiene Commission. The child must first be certified a psychotic.

Welfare Director Brewer feels the city urgently needs a centralized inpatient facility for all children. Health Department out-patient clinics now serve only a handful of children.

The National Institute of Mental Health estimated that only 107 children could be treated here at any one time.

This is only slightly more than the number of children under Court jurisdiction receiving treatment at Laurel. The number does not include thousands of other non-delinquent disturbed youths.

### Particularly Urgent

Because of inadequate phychiatric resources, juvenile court judges may be under pressure to waive certain types of children to adult court in hopes that the child can get treatment through the more ample services available there.

Once out of juvenile jurisdiction, however, there is no guarantee the youth will get treatment rather than jail.

Suburban communities feel the lack of adequate mental health installations, too. Studies have shown only a tiny fraction of the Nation's disturbed children can get care. But District officials point out that in urban areas such as Washington, with minority and low-income populations, the need is particularly pressing.

264

Before BAZELON, Chief Judge, and FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER, WRIGHT and McGOWAN, Circuit Judges, in Chambers.

ORDER

PER CURIAM.

On consideration of appellant's motion for leave to file a petition for rehearing *en banc,* the time having expired, and of appellant's subsequently filed motion for leave to withdraw the aforesaid motion for leave to file a petition for rehearing *en banc,* the time having expired, it is

ORDERED by the Court *en banc* that appellant's motion for leave to withdraw his motion for leave to file a petition for rehearing *en banc* be granted, and the Clerk is directed to mark the records of his office reflecting the withdrawal of appellant's motion for leave to file a petition for rehearing *en banc.*

BAZELON, Chief Judge, with whom WRIGHT, Circuit Judge, joins (dissenting):

The appellant was a 16-year-old child in 1961 when the then single judge Juvenile Court waived jurisdiction over him. On trial in the District Court he was found guilty on three counts of housebreaking and three counts of robbery,[1] but not guilty by reason of insanity on two counts of rape during the other crimes. This Court of Appeals upheld the Juvenile Court's waiver and affirmed the criminal convictions.

When it was too late to file a timely motion for rehearing, appellant moved for leave to file out of time a petition for rehearing en banc. He has now moved to withdraw that motion in order to petition the Supreme Court for certiorari.

A confession of error by the government in a criminal appeal does not relieve the appellate court of its obligation to consider whether the requested reversal is consistent with the public interest. Parlton v. United States, 64 App.D.C. 169, 75 F.2d 772 (1935).[2] The same principle applies here. When a motion for leave to withdraw a pleading in a criminal case involves a question that affects the administration of justice, we must consider whether the requested withdrawal is consistent with the public interest. "[O]ur judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of parties." Young v. United States, 315 U.S. 257, 259, 62 S.Ct. 510, 511, 86 L.Ed. 832 (1942). If, as I think, the public interest requires that appellant's appeal from his conviction be reheard en banc, withdrawal of his motion for leave to file a petition for rehearing en banc is not consistent with the public interest. I therefore vote to deny his motion to withdraw that motion.

As Judge WASHINGTON'S concurring opinion recognizes, "It is a fair inference from the record before us that one of the reasons why the Juvenile Court waived jurisdiction was because appellant was seriously disturbed and the Juvenile Court lacked facilities adequately to treat him." I think it shocking that a child was subjected to prosecution and punishment as a criminal because he was thought to suffer from a serious mental or emotional disturbance. I can think of no stronger reason for not doing this.

Waiver of the Juvenile Court's jurisdiction over a child amounts to a proposal that he be prosecuted in the District Court as a criminal. A prosecution is an attempt to impose punishment. The Juvenile Court has no reason and in my opinion no right to assume that this attempt will fail. In the present case the attempt resulted in a sentence of thirty to ninety years.

---

1. The District Court sentenced him to consecutive terms of five to fifteen years on each of these six counts, a total of thirty to ninety years, and committed him to St. Elizabeths Hospital until he is found sane, then to serve any remainder of his prison sentence.

2. See Upshaw v. United States, 83 U.S. App.D.C. 207, 168 F.2d 167 (1948).

"If the juvenile court cannot find within its purview the means to rehabilitate children and to contain them during the treatment ·process, it is ·futile to look to the ·criminal courts for help. When the juvenile court washes its hands of a child, it throws him on the scrap heap of a prison and it gains nothing by employing euphemisms to describe this tragedy. * * * As long as the juvenile court practices the self-deception that allows it to believe ·in the existence of facilities 'elsewhere,' it will not face squarely the need to develop for itself the tools it requires to care for these children. [Sargent & Gordon, *Waiver of Jurisdiction: An Evaulation of the Process in the Juvenile Court,* 9 CRIME & Delinquency 121, 125 (1963).]"

When this court affirmed appellant's conviction, a majority took the position that it did not know why the Juvenile Court had waived jurisdiction over appellant but would trust to "the skill and experience of the specialist judge * * *" Accordingly this court made no use of its statutory authority[3] to review the "social records" of the Juvenile Court concerning the appellant. In effect, this court set up an irrebuttable presumption that a waiver of jurisdiction by the Juvenile Court is proper. This conflicts with the Juvenile Court Act,[4] with our previous opinions,[5] and with the court's observation in this very case that waivers must not be "arbitrary or capricious."

Though our reviewing authority is of limited scope, it exists. There can be no intelligent review of the Juvenile Court's waiver of jurisdiction unless the reasons for it are stated *on the record.* With-

out the benefit of such statement, the child's counsel ·is duty-bound to pursue by inquiry and challenge every matter conceivably affecting the waiver decision in order to ·make a record for review. This will formalize and burden the Juvenile Court procedures and necessarily accentuate the adversary role of counsel.

---

3. District ·of Columbia Code § 11–1586(b) (Supp. III, 1964) provides that Juvenile Court social records "shall be made available * * * to any court before which the child may appear." See Watkins v. United States, 119 U.S.App. ——, 343 F.2d 278, decided November 13, 1964.

4. D.C.Code § 11–1553 (Supp. III, 1964).

5. Green v. United States, 113 U.S.App.D.C. 348, 308 F.2d 303 (1962); Franklin v. United States, 117 U.S.App.D.C. 331, 336, 330 F.2d 205, 210 (1964). See United States v. Anonymous, 176 F.Supp. 325 (D.D.C.1959); United States v. Stevenson, 170 F.Supp. 315. (D.D.C.1959).