**John A. NAPLES, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 20312.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 19, 1967.

Decided July 25, 1967.

Petition for Rehearing En Banc Denied Oct. 19, 1967.

---

3. D.C.CODE §§ 47–1557a(b) (11) and 47–1551c(l) (1961).

Messrs. Joseph L. Rauh, Jr., and Daniel H. Pollitt, Washington, D. C. (both appointed by this court), for appellant.

Mr. Charles L. Owen, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. ·S. Atty., were on the brief, for appellee. Messrs. James A. Strazzella and John A. Terry, Asst. U. S. Attys., also entered appearances for appellee.

Before BAZELON, Chief Judge, and McGOWAN and ROBINSON, Circuit Judges.

McGOWAN, Circuit Judge:

In this appeal we deal with a crime which was committed in 1958. It appears to have involved an unoffending victim who met her death at the hands of a marginal human being.[1] The tortuous course the case has taken for nearly nine full years must, in the minds of lay observers at least, raise serious doubts as to the efficacy of our system of criminal justice. A lawyer might, contrarily, think that this seemingly interminable delay is not the fault of the system but of its misapplication, perhaps at more levels than one. Certainly no one connected with the system in any way can be other than chagrined at the way it has worked in this instance.

But long delay does not dispense with the necessity of applying the rules of the system as they are supposed to operate. On this appeal from conviction a third time, appellant has urged a number of reasons why that conviction should be reversed. We find merit in the first of these, which involves the asserted inadmissibility of a confession in the light of Rule 5(a), FED.R.CRIM.P. (see Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957)); and we reverse and remand for a new trial without reaching the others. In doing so we record the hesitancy with which we fail to follow a ruling by the experienced and able trial judge, from whom no criminal defendant has ever received other than a designedly fair, conscientious, and compassionate trial. But, as will appear hereinafter, we think Judge Youngdahl was placed at a considerable disadvantage by earlier decisions of this court in this case; and it was the trial judge's own informed pertinacity in questioning the witnesses which elicited answers compelling our conclusion that the ground rules were ignored in what we have no doubt was

---

1. The first trial in this case was delayed for two years because of appellant's commitment to St. Elizabeths as incompetent to stand trial. As the end of that trial which, like the two succeeding ones, was preoccupied with the insanity defense, Judge Holtzoff, who presided, announced that he would recommend executive clemency because the evidence had demonstrated "that the defendant is mentally below the average and is in fact subnormal." United States v. Naples, 192 F.Supp. 23, 45 (D.D.C.1961).

The evidence in this third trial suggests that Naples may be seriously ill and also that because of his illness he may be "likely to injure himself or other persons if allowed to remain at liberty". 21 D.C. Code §§ 544, 545 (Supp. V, 1966). If so, Naples would seem a fit subject for civil commitment. Thus far, the Government has maintained that Naples is not "mentally ill." However, "mental illness" has a very specialized meaning when the defendant claims that he is not criminally responsible for his act. McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962). "Mental illness" may have quite a different meaning in other contexts. Therefore, neither the Government's position in this litigation, nor the juries' verdicts, nor the trial judges' refusals to direct verdicts, nor our decisions on appeal, has any *necessary* relation to the question of whether Naples is "mentally ill" within the meaning of the civil commitment statute.

a well-intentioned effort by one segment of the system to perform a function assigned to another.

## I

The quotation in the margin from our first opinion in this case describes the essential facts of the crime and the circumstances in which appellant was arrested for it.[2] Between the time of his arrest at approximately 1:00 P.M. on December 17 and approximately 4:30 P.M. the same day when he was taken before a magistrate, three confessions were obtained. The last in this series consisted of admissions made by appellant to police officers when they took him from Precinct No. 9 station to the victim's apartment for a reenactment of the crime. This court, sitting *en banc*, held that these admissions should have been excluded under *Mallory*, and that a new trial was required. At the same time, it held that the first confession, to be described hereinafter, was correctly admitted. Its discussion of this latter issue was limited to two sentences: "The entire conversation did not take over five or ten minutes. There was no suggestion on the record that the Naples statement was other than completely voluntary and spontaneous." 113 U.S.App.D.C. at 283; 307 F.2d at 620.

At the second trial the prosecution sought to replace the reenactment admissions with admissions allegedly occurring at an intermediate stage following the first confession but prior to the reenactment of the crime. This court reversed because it thought the introduction of this evidence violated the hearsay rule. In respect of the renewed objections by the defense to the first confession, this court said only that, without reexamining the merits of the earlier holding, "we apply it as the law of the case to sustain admission of this testimony." Naples v. United States, 120 U.S.App.D.C. 123, 125, 344 F.2d 508, 510 (1964).

When counsel were appointed to represent appellant in his third trial, they sought clarification from this court as to the continued amenability of the first confession to attack. The court denied the motion for clarification of its opinion but, in doing so, it stated that in the impending trial the "law of the case" doctrine "would not operate to bar consideration of the admissibility of these confessions based upon material facts not heretofore adduced[2] or supervening law.[3]" Footnote 2 in this context consisted of the citation of a number of recent cases of this court to be compared in relation to "the application of *Mallory*

2. Naples v. United States, 113 U.S.App. D.C. 281, 282–283, 307 F.2d 618, 619–920:

> On the night of December 16, 1958, the body of one Edna G. Jewel was discovered on the floor of her apartment at 225 Massachusetts Avenue, N.E., in the District of Columbia. An autopsy disclosed that she had died from stab wounds in the neck and chest. The apartment had been ransacked; closets and bureau drawers had been opened and their contents had been thrown on the floor. Louis and John A. Naples, twin brothers, were previously known to Detective Buch who, on the night of the crime, was one of many officers who made a police canvass of the neighborhood. He then learned that the Naples brothers lived at number 227 Massachusetts Avenue, next door to the scene of the homicide.
>
> The next day Detective Buch received a telephone call from an unidentified caller who stated that he had a "friend" who was known to carry a knife and who might have been involved in the homicide. The caller phoned again shortly and suggested that the officer meet him at the Palace Theater where the officer was to ask for "Louis." Buch went to the theater and there recognized Louis Naples who then told him that it was his brother, the appellant here, to whom he had referred. Appellant carried a knife in an overnight bag, Louis said, and had told him the previous night that he had done something awful and would not be home for some time. Louis phoned the Y.M.C.A. and reported to officer Buch that the appellant had spent the night there, but was coming to the theater. The officer verified the fact that John Naples had checked out of the Y.M.C.A. When John Naples arrived at the theater carrying a canvas bag, the officers arrested him.

and the rule of 'spontaneous confessions' to varied factual situations * * *." Footnote 3 was a bare citation of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Naples v. United States, 123 U.S.App. D.C. 292, 293–294, 359 F.2d 276, 277–278 (1966).

■ The third trial finished only a short time before the Supreme Court decided Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The trial judge postponed his decision on the motion for a new trial in order that appellant might be assured of the court's consideration of that motion in the light of whatever might be forthcoming in that case. What came, of course, was not only *Miranda*, but the Supreme Court's limiting interpretation of the reach of *Escobedo* and the non-retroactivity rulings of Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Because of these circumstances, we do not disturb the District Court's refusal to regard the confession as invalidated by any supervening law deriving from the Fifth and Sixth Amendments.

The crucial issue thus becomes that of whether the third trial revealed for the first time "material facts" which would lift the bar of the law of the case to a reexamination of the propriety, under *Mallory*, of the first confession. The District Court was of the view that, because the facts relating to the confession, as adduced at the hearing of the motion

to suppress, were *"substantially identical* to the facts relied [upon] in Naples I, this Court is precluded under the recent memorandum of the Court of Appeals from reconsidering the admissibility of this confession on Mallory grounds." [Emphasis added.]

We think the learned district judge was right in the way he posed the problem, even as we believe that, absent new evidence, we would not now be free to disregard two earlier decisions by this court (one *en banc*) sustaining the admissibility of the confession. We disagree only with his conclusion that nothing of a new and material character emerged in the testimony before him which entitled appellant to have a fresh look taken at his *Mallory* contention. We hasten to add that, to the extent the trial court's observations in this regard were intended to be limited to purely physical facts surrounding the arrest of appellant and his interrogation at the police station, we would largely agree that they were "substantially identical." But what was utterly—and, we think, devastatingly—new was the detailed ventilation of the purposes of that interrogation. It is surely beyond question that *Mallory*, in 1958 and continuously ever since, is concerned with the concept of purpose entertained by the policeman interrogating after arrest and before presentment.[3] And the thesis that the state of a man's mind is as much a fact as the state of his digestion, is not without validity, at least in a context such as this. With these propositions at hand we

---

3. In *Mallory* the Supreme Court characterized the requirements of Rule 5(a) in these terms:

The scheme for initiating a federal prosecution is plainly defined. The police may not arrest upon mere suspicion but only on "probable cause." The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be "booked" by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if

not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.

The duty enjoined upon arresting officers to arraign "without unnecessary delay" indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession.
354 U.S. at 454–455, 77 S.Ct. 1356, 1359, 1 L.Ed.2d 1479.

turn to the evidence taken out of the presence of the jury at the hearing on the motion to suppress.

## II

Officer Buch was the first witness, and he covered familiar ground with respect to the circumstances under which he arrested appellant. He did testify that, at the time he arrested appellant at the theatre, he overheard appellant say to his brother that he had done nothing wrong. He described his search at that time of the bag carried by appellant, and of finding in it a pair of women's gloves and a large knife covered with what appeared to be blood. In response to questions from the Court, Buch said that he was convinced that he had probable cause to arrest appellant and to take him before a magistrate. He said that he did not need authority from any superior officer to make such a presentment. He also said, however, that it was the practice to inform a superior of an arrest in this kind of case, and that he called Lt. (now Captain) Culpepper for this purpose from the theatre. When they arrived at the station, Buch said that he departed from the usual practice of making a lineup sheet and booking appellant; and that, instead, he took appellant to the second floor office of Culpepper. After telling Culpepper what had happened, he said that Culpepper took appellant alone into his office.[4]

In response to bench questions, Buch said that he would not have released appellant if he had refused to answer questions or had persisted in denials. In such event, he said, he would have charged him and taken him before a magistrate, secure in the belief that the arrest had been legal and that there was probable cause to warrant the magistrate's holding appellant for grand jury action.

4. Buch later ventured his opinion to be that it was desirable for appellant to be interrogated before presentment since this might disclose that he was the innocent victim of his brother's enmity or that the brother was an accomplice. Under the circumstances, this can only be an opinion that interrogation might confirm the

The only other witness at the hearing was Captain Culpepper. He told of meeting Buch and appellant on the second floor of the police station, and of Buch's telling him what had happened. At that point the court engaged in a long colloquy with the witness:

THE COURT: After Detective Buch had given you that information, did you feel he had probable grounds to have arrested him on the basis of having committed a homicide?

THE WITNESS: Yes, sir.

THE COURT: Do you feel, also, Captain Culpepper, that there was also sufficient basis then to bring the defendants [sic] before a Magistrate for a preliminary hearings [sic]?

THE WITNESS: Not before I talked to him, no, sir.

THE COURT: You didn't?

THE WITNESS: No, sir, I did not.

THE COURT: Then you are in disagreement with Detective Buch on that score. He has indicated here just a few moments ago that he felt from the information he had when he arrested the defendant that there was— he had sufficient evidence then to bring the defendant before a magistrate for a preliminary hearing.

THE WITNESS: If that is his feeling, then I definitely disagree with him, sir.

THE COURT: You disagree with him?

THE WITNESS: Yes, sir.

THE COURT: Why didn't you feel there was sufficient information to bring the defendant before a grand jury on the basis that his brother had indicated that the defendant had told him that he had done something awful the night before, he had been out late, and that he committed his act with

denial of guilt by appellant which Buch had heard at the time and place of the arrest. It does not appear that Buch told Culpepper of this denial when he and his prisoner arrived at the station. Culpepper also testified that he did not know about the gloves.

the knife after Detective Buch had informed you that he had found the bloody knife in this bag plus a pair of lady's gloves?

With that information, why didn't you feel it was sufficient to bring the defendant before a magistrate?

THE WITNESS: Well actually, your Honor, he did not say that his brother had committed this particular act with this knife. We had no real connection with this act and I wanted to give this young man an opportunity to explain, if he could, how the knife came into his possession, if it was blood, if he had committed an offense, and not only did I want him to explain if he had committed the offense, I wanted him to prove to me that he had done it before I would.

THE COURT: Didn't the brother indicate that it involved an elderly lady?

THE WITNESS: Not to my recollection, sir.

THE COURT: When you say "not to my recollection," is it because you do not remember it, or you deny that he did say it?

MR. WADDEN: Your Honor, I did not hear your question.

THE COURT: I asked the Captain about it because he does not remember it, or he denies he was given that information by Detective Buch.

THE WITNESS: He told me, your Honor, that Louis Naples called him twice, said he had done something—I believe the word was—"terrible."

THE COURT: To whom?

THE WITNESS: Didn't say. And I would say that he did not tell me to whom he had done it.

THE COURT: I see.

Go ahead, Mr. Wadden.

THE WITNESS: Were you talking to me?

THE COURT: Go ahead, Mr. Wadden.

THE WITNESS: I feel that this case, unlike the case where there were writtens [witnesses?] that there was an opportunity for justice to go astray perhaps his brother was lying about him, that was something in my mind.

I felt I was honor bound, both to him and to Miss Jewel to talk to him and give him an opportunity to explain any circumstances that he might, that he might be able to explain that would take suspicion away from him.

THE COURT: If he had denied that he was involved in any way in the homicide of this lady, would you have released him?

THE WITNESS: No, sir, I do not believe so.

THE COURT: What would you have done?

THE WITNESS: We would have tried to get the brother in and possibly had the brother go into more detail.

THE COURT: *Suppose the brother did not go into more detail and you had only the information that you had at that time, would you have him put on the street?*

THE WITNESS: *I do not know. I not not believe we could have convicted him.*

THE COURT: Why do you say you do not know?

THE WITNESS: I really do not know. You are asking me if I would have turned him scott free.

THE COURT: If all the information you had was the information Detective Buch had informed you about, if he did not inform you of the whole story, whatever details he had, that is all he had, and you called the brother in and you got further information from him, or anyone else upon further questioning, would you have turned the defendant loose, or would you have brought him before a magistrate? You had the bag, you had the bloody knife in the bag, you had a pair of lady's gloves, you had the brother who did say his brother had done something awful.

THE WITNESS: I did not have any knowledge of the gloves at that

time. I had knowledge that the brother had said that he had done something awful. He did have a knife with what appeared to be, or what could have centainly been blood stains.

THE COURT: There was not any doubt about that, was there?

THE WITNESS: Not in my mind; no sir.

THE COURT: Not in your mind.

THE WITNESS: This is a relative thing, your Honor. The Courts have changed through the years, as you will know, much better than I do. There have been times that I would have charged this man. Today I would have to release him.

THE COURT: Of course you understand bringing a defendant before a magistrate isn't indicating there is sufficient evidence to convict.

THE WITNESS: I am sorry, sir.

THE COURT: You understand the difference in what is necessary to do in bringing a defendant before a magistrate to hold him for the Grand Jury?

THE WITNESS: Yes, I do.

THE COURT: And what evidence is sufficient to make a prima facie case before a petit jury in a criminal case, you understand that?

THE WITNESS: Yes, sir, I do.

THE COURT: Now, the reason I ask you this is because Detective Buch indicates that if he had gotten no further evidence, he would have brought him before the magistrate because he felt he had sufficient basis to arrest him and probable cause on the basis of having committed a homicide.

Aren't you in agreement once you have sufficient basis, assuming arguendo, that you do, to arrest a man for the commission of a homicide, that that forms the basis for bringing the defendant before the magistrate?

THE WITNESS: Generally, yes, sir.

THE COURT: Well, isn't it always true that that is the real test?

THE WITNESS: I would not certainly evade the real test, sir.

THE COURT: Obviously, it is better for the government to get more details. I can well understand that, get more information and fortify its case, get a confession if possible and fill in certain details where there may be a vacuum. But, on the other hand, assuming you cannot get those further details, would you have put the man out on the street, or would you have brought him before the magistrate and let the magistrate determine the issue?

THE WITNESS: Let me answer you this way, if I may, Judge. If he had told me that he had a fight with his brother and his brother was mad with him, and if he said "I know where you got that, you got that information from my brother, he is trying to get me in trouble," I do not believe I would have taken him to a magistrate under those circumstances.

Again, if he had said, "I won't talk, I won't say anything, I want to see my lawyer," I believe I probably would have taken him before a magistrate.

THE COURT: All right. [Emphasis added.]

We think, and we have the impression that Judge Youngdahl did also, that the picture emerging from this testimony is that of a conscientious officer who confused police with prosecutorial functions. It is the function of the police to investigate crime, to arrest when there is probable cause to do so, and to put the prisoner in the channels leading to his prosecution. It is not the function of the police to convict. And it is the purpose of Rule 5(a) to draw a line between these functions.

Officer Buch made a determination at the theatre that there was probable cause to arrest appellant. This court *en banc* fully sustained this exercise of his judgment when it was challenged. Without that determination, Buch could not lawfully have taken appellant into custody at all, either to go to the police station or to the magistrate. With it, the Rule 5(a) route is to the magistrate, at least with-

out that delay which, in the Supreme Court's words, is for the purpose of eliciting a confession. Captain Culpepper, to the trial court's obvious surprise, purported to draw a distinction between the evidence admitting of a lawful arrest and the bringing of appellant to the police station for booking, on the one hand, and that additional quantum of proof which would justify taking appellant before the magistrate. There is, however, no such distinction known to the law, either now or in 1958 or in 1925.[5]

There is, of course, a vital distinction, as Captain Culpepper appeared to recognize when pressed by the court, between (1) the evidence required to justify an arrest and the holding of the arrestee by the magistrate for grand jury action, and (2) the proof which will support a verdict of guilty at trial. But it is the responsibility of prosecutors, not police, to get indictments and to convict under them. And the Congressionally-authorized Rule 5(a) was designed to terminate the period of initial police custody when the assembly of the former evidence is complete. Had Captain Culpepper not taken it upon himself to interview appellant privately, Officer Buch would have booked appellant at the station and then taken him before a magistrate. The latter would have explained to appellant his right to remain silent, the adverse use which could be made of anything he chose to say, his right to retain counsel, and his right to have a hearing before the magistrate on the question of whether there was probable cause for his arrest and continued detention.[6] We do not assume that this alternative, had it been observed, would necessarily have resulted in no confession or left appellant other than in custody awaiting grand jury action. But he would have emerged from the initial and exclusive police custody; he would have been entrusted to the civilian and judicial processes for handling those whom the police believe to have committed crimes; and the legislative prescriptions for these processes would have been observed. There are, needless to say, values in all these which transcend any particular case.

Captain Culpepper's colloquy with the trial court ends on a suggestion that the

5. Too often both court and counsel refer to the so-called "Mallory rule" as if it were solely a product of judicial decisions and rules of procedure. Congress, in according the police of the District of Columbia the right to arrest without warrant, has by statute long required them "without delay, upon such arrest, [to] convey in person such offender before the proper court, that he may be dealt with according to law." 4 D.C. Code § 140 (1961). Mr. Justice Frankfurter, in *Mallory*, speaking of Rule 5(a), noted that "[t]he requirement that arraignment be 'without unnecessary delay' is a compendious restatement, without substantive change, of several prior specific federal statutory provisions. * * * Nearly all the states have similar enactments." 354 U.S. at 452, 77 S.Ct. at 1358.

6. At the time in question, Rules 5(b) and (c) were in the following form:

(b) STATEMENT BY THE COMMISSIONER. The commissioner shall inform the defendant of the complaint against him, of his right to retain counsel and of his right to have a preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. The commissioner shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail as provided in these rules.

(c) PRELIMINARY EXAMINATION. The defendant shall not be called upon to plead. If the defendant waives preliminary examination, the commissioner shall forthwith hold him to answer in the district court. If the defendant does not waive examination, the commissioner shall hear the evidence within a reasonable time. The defendant may cross-examine witnesses against him and may introduce evidence in his own behalf. If from the evidence it appears to the commissioner that there is probable cause to believe that an offense has been committed and that the defendant has committed it, the commissioner shall forthwith hold him to answer in the district court; otherwise the commissioner shall discharge him. The commissioner shall admit the defendant to bail as provided in these rules.

purpose of his interrogation was not to elicit a confession but to make sure that they did not have the wrong man.[7] It has been asserted by eminently respectable authority that this purpose renders reasonable delay in presentment,[8] and so it may be. Were that the purpose of the interrogation, Captain Culpepper's inquiry would presumably have been somewhat like this:

> You have been arrested for the murder of Miss Jewel because your brother told Officer Buch that you had said you had done something bad, because you had a knife, and because your mother suddenly appears to have a strange woman's wallet. When you came to the theatre your bag contained a knife with what appears to be blood upon it. So long as this is all we know, we think it probable that you killed Miss Jewel; and it is our duty under the law to book you on that charge and take you before a magistrate. He will tell you that you do not, now or later, have to say anything at all to us or to anyone else; and that, if you do say anything, it can be used against you. He will also tell you [as of 1958] that you can retain a lawyer; and that you can have a hearing before him on the question of whether we were right to have arrested you. Unless there is something you want to tell us now that indicates we should not have arrested you at all and should now let you go,

we will go ahead with the booking and take you to appear in court.

Captain Culpepper's testimony as to the actual interrogation was as follows:

> Q. Captain, would you direct your attention now to the time you went in the room? Where was the defendant seated, if you recall?
>
> A. He was seated in the middle of the room and I pulled up a chair and sat right in front of him, just a few feet away from him.
>
> Q. Was anyone else in the room?
>
> A. No, sir.
>
> Q. What were the first words you said to him, if you can remember?
>
> A. I believe I explained to him in detail that I was a policeman, and then I told him that he did not have to talk to me or make a statement unless he wanted to. And he said he knew that, or "I know it." I am not sure which.
>
> Q. What then did you say to him, or what did he say to you?
>
> A. I asked him if he had done something wrong, something he was ashamed of, and he indicated he did not know what I was saying, didn't know what I was referring to.
>
> I asked him if he had not done something that he knew was wrong, and that he was ashamed of, and that he wanted to tell me about.
>
> His answer was, "do you mean about the lady?" I said, "Yes."[9]

---

7. Earlier in his testimony Captain Culpepper seemed genuinely surprised at the trial court's suggestion that interrogation might have resulted in appellant's release without being charged. The witness's responses in this connection do not suggest that Captain Culpepper was prepared under any circumstance to let appellant go, as he put it, "scott free."

8. See, e. g., 8 MOORE FEDERAL PRACTICE ¶ 5.02 [4], at 5–21, 5–22 (Cipes Ed. 1966):

    Where the police make a lawful arrest, it seems possible to give them some slight leeway in questioning without doing violence to the *McNabb-Mallory* policy. If initial interrogation were confined to the skeletal questioning approved in the *Heideman* case [104 U.S.

App.D.C. 128, 259 F.2d 943 (1958), cert. denied, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959)], the police could then be given an opportunity to investigate leads, check alibis, or conduct laboratory analyses, and to confront [the] defendant with any additional independent evidence prior to arraignment. In this way the use of scientific techniques of crime detection without resort to "grilling" could be encouraged. [Footnotes omitted.]

9. The confession followed in the form of a narrative interspersed with questions by Captain Culpepper. Appellant was said to have related that he was prowling the hallway, looking for something to steal, when he noticed that the door of the victim's apartment was ajar. He entered

We think it significant that there was only a partial warning, see Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), and that there was no inquiry at any time as to appellant's relations with the brother who turned him in. Moreover, we cannot be oblivious of what happened immediately thereafter. Appellant was booked at 1:52 P.M., but the trip to the magistrate did not follow upon that. Captain Culpepper first had Captain Hartnett come so that he could hear about appellant's confession in appellant's presence. Then appellant was taken to the victim's apartment for the reenactment of the crime which was accompanied by the third confession. The visit to the magistrate came at 4:30 P.M. There could have been no doubt in Captain Culpepper's mind by that time that, in his phrase, "we could have convicted him." The essential purpose of the first and succeeding interrogations had been amply realized.

■ With that purpose appearing as clearly as it does here, we look only to *Mallory* itself as commanding reversal on this record, and we disclaim any purpose to found this result on any supervening law in this field in our own cases. There has undoubtedly been a progression in the thinking of at least some members of the court about delay in presentment for the specific purpose of police interrogation.[10] That progression has roughly paralleled the visible movement by the Supreme Court towards the application of Fifth and Sixth Amendment considerations to the pre-arraignment period. That movement culminated, of course, in *Miranda,* in the shadow of which Rule 5(a) now resides and which has probably made academic problems of the kind we confront on this record. As the concept of voluntariness in any literal sense has seemed to the Supreme Court to be of diminishing relevance, so has that approach affected attitudes toward such matters as the precise length of time consumed by the questioning.[11] But, so long as *Mallory* is the authentic Supreme Court voice on Rule 5(a), the *purpose* of the interrogation, whether it be long or short, can never be anything but critical. That purpose is—and has been since *Mallory*—the crucial fact in measuring the reasonableness of delay in presentment after arrest. When the record shows, as it does now in appellant's case for the first time, that delay for interrogation ensued because, in the words of the interrogator, "I do not believe we could

to look for money. "The lady" surprised him in the act of searching the apartment, and, throwing her pocketbook at him, ordered him to "get out of here." Naples claimed to have blacked out at this point; and, upon coming to, he found himself with a knife in his hand. He saw the deceased on the floor, and knew that "he had hurt the lady."

10. *Compare* Alston v. United States, 121 U.S.App.D.C. 66, 348 F.2d 72 (1965); Greenwell v. United States, 119 U.S. App.D.C. 43, 336 F.2d 962 (1964), cert. denied, Greenwell v. Anderson, 380 U.S. 923, 85 S.Ct. 921, 13 L.Ed.2d 807 (1965); Spriggs v. United States, 118 U.S.App.D.C. 248, 335 F.2d 283 (1964); Ricks v. United States, 118 U.S.App.D.C. 216, 334 F.2d 964 (1964) *with* Bailey v. United States, 117 U.S.App.D.C. 241, 328 F.2d 542, cert. denied, 377 U.S. 972, 84 S.Ct. 1655, 12 L.Ed.2d 741 (1964); Muschette v. United States, 116 U.S. App.D.C. 239, 322 F.2d 989 (1963), rev'd on other grounds, 378 U.S. 569, 84 S.Ct. 1927, 12 L.Ed.2d 1039 (1964) (*per curiam*); Lockley v. United States, 106 U.S.App.D.C. 163, 270 F.2d 915 (1959); Porter v. United States, 103 U.S.App.D.C. 385, 258 F.2d 685 (1958), cert. denied, 360 U.S. 906, 79 S.Ct. 1289, 3 L.Ed. 2d 1257 (1959); Metoyer v. United States, 102 U.S.App.D.C. 62, 250 F.2d 30 (1957). See also Naples v. United States, 123 U.S.App.D.C. 292, 294, 359 F.2d 276, 278 n.2 (1966).

11. It is clear that the elapsed time here was not great, whether it be the "five or ten minutes" once testified to by Captain Culpepper at an earlier trial, or the thirty-five minutes suggested by appellant. It was said in Alston v. United States, 121 U.S.App.D.C. 66, 69, 348 F.2d 72, 75 (1965) (McGowan, J., concurring), that "[t]he period of time consumed by an interrogation may well be less significant than the spirit in which it is conducted." In the same way, it could be said that the time consumed by a delay for questioning is not as important as the purpose of the delay.

have convicted him," we think this court, whether it be speaking in 1962 or 1967, has no choice but to regard the confession so elicited as proscribed by *Mallory*.

The judgment of conviction is reversed, and the case is remanded for a new trial.

It is so ordered.