Morris A. KENT, Jr., Appellant,

v.

UNITED STATES of America,
Appellee.

No. 20922.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 23, 1968.

Decided July 30, 1968.

Messrs. Myron G. Ehrlich and Samuel A. Stern, Washington, D. C., with whom Mr. David L. Chambers, III, Washington, D. C. (all appointed by this court) was on the brief, for appellant. Mr. Robert A. Warden, Washington, D. C., was also on the brief for appellant.

Mr. Thomas Lumbard, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Allan M. Palmer, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and BURGER and MCGOWAN, Circuit Judges.

BAZELON, Chief Judge:

The Supreme Court has recently revolutionized the procedural aspects of juvenile court proceedings.[1] Today we face the more fundamental issue of the substantive role of juvenile courts. In particular we must determine what obligations juvenile authorities, acting as *parens patriae*, have with respect to mentally disturbed adolescents.

I

At the age of sixteen the appellant, Morris Kent, was accused of committing several robberies and rapes. He was waived by the juvenile court and indicted on three counts of housebreaking, three counts of robbery, and two counts of rape. A jury returned a verdict of guilty on the housebreaking and robbery counts and not guilty by reason of insanity on the rape counts. The district court sentenced him to thirty to ninety years, with credit for the time spent in Saint Elizabeths Hospital pursuant to D.C.Code § 24–301(d).[2]

Kent appealed his conviction, contending that the juvenile court had waived him without an adequate hearing. After this court affirmed his conviction, the Supreme Court reversed and directed the district court to hold a full-dress *de novo* hearing to determine whether Kent should have been waived in 1961.[3]

At the remand hearing, the district court, sitting as a juvenile court, found that the 1961 waiver was "appropriate and proper." We conclude that, due to inaccuracies in several of the district court's findings, its decision cannot be sustained. We conclude further that, in view of the district court's finding that Kent was suffering from a serious mental illness, waiver was inappropriate.

II

Many of the findings below are incontestable. Morris Kent had "engaged in extensive criminal activity characterized by aggressiveness and violence" and had not responded satisfactorily to his previous contacts with the juvenile court. He "was suffering from a psychosis known as schizophrenic reaction, chronic undifferentiated type" and "there was reason to believe that a period of time beyond the limits of the juvenile court's jurisdiction was required for reasonable prospects of rehabilitation". Moreover, the juvenile court's long-term confinement facilities could not provide adequate psychiatric treatment for psychotic children.

Because of the obvious inadequacy of the juvenile detention facilities, Kent urged that the juvenile court should have taken steps to civilly commit him to Saint Elizabeths Hospital. The district court found that Kent was indeed civilly committable in 1961. But it determined that "because of the defendant's potential danger to himself and/or others his civil commitment in 1961 was an inappropriate alternative to waiver in the dis-

1. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

2. He has been in Saint Elizabeths Hospital ever since trial.

3. Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). The Supreme Court did not consider several substantive issues raised by Kent. In view of our present disposition of the case, we do not consider them either.

trict court." This finding turns civil commitment law on its head. Under D.C.Code § 21–541, a person may be involuntarily committed *only* if "[he] is likely to injure himself or other persons" due to mental illness. Dangerousness does not make civil commitment "inappropriate;" it makes civil commitment appropriate.

In rejecting civil commitment, the court relied on a series of Government-proposed findings to the effect that civil commitment did not provide adequate protection for society. The reliance is misplaced since these findings are based on erroneous assumptions and unwarranted speculations. One finding divined that on civil commitment, Saint Elizabeths Hospital would have committed defendant to a nonsecurity facility from which he could elope, rather than to the maximum security facility, John Howard Pavilion. But the record does not convince us that Saint Elizabeths would be so negligent and incompetent as to knowingly place a person who needed a secure setting in a nonsecure one.[4] Another finding was that a "person who is civilly committed to Saint Elizabeths Hospital may be released by the doctor in charge of the case without any prior court authorization," the implication being that the doctor may act negligently or ignorantly. Pursuing this speculation further, the court found that if the de-

fendant were released before age twenty-one the juvenile court could not have reinstated charges because "as a matter of practice" it would drop charges against a child committed to Saint Elizabeths. There is no support in the record for a determination that Saint Elizabeths' doctors will prematurely recommend release for criminally dangerous psychotics.[5] And if they did release Kent before age twenty-one, the juvenile court could have reinstated charges. The fact that charges had been dropped in a few cases in the past does not mean they had to be dropped in Kent's case.

Since the district court's decision that waiver "was appropriate and proper" was based heavily on these defective findings, the decision must be vacated and set aside.

## III

Both the Supreme Court and this court have stated that "[I]t is implicit in [the juvenile court] scheme that noncriminal treatment is to be the rule—and the adult criminal treatment, the exception which must be governed by the particular factors of individual cases." Kent v. United States, 383 U.S. 541, 560, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84 (1966) quoting with approval Harling v. United States, 111 U.S.App.D.C. 174, 177–178, 295 F.2d 161, 164–165 (1961). We believe that on the facts of this case waiver was inappropriate.[6]

---

4. Dr. Owens testified that "ordinarily" civilly committed patients are not placed in John Howard unless they have escaped from or caused trouble in other wards. But we cannot assume that persons requiring maximum security in John Howard will not be placed there simply because they were civilly committed or, conversely, that persons not requiring maximum security will be placed in John Howard simply because their commitment arose out of criminal proceedings. If the Hospital is following erroneous practices, the court should expressly reject them, rather than rely on them. We note that there may be many situations in which criminally dangerous persons enter Saint Elizabeths via civil commitment. See, *e. g.*, Cameron v. Mullen, 128 U.S.App. D.C. 235, 387 F.2d 193 (1967) ; Naples v.

United States, 127 U.S.App.D.C. 249, 382 F.2d 465, 466 n. 1 (1967).

5. We note also that this court has heard numerous D.C.Code § 24–301(d) cases in which Saint Elizabeths' doctors oppose the release of persons whose stay at the Hospital far exceeds the maximum sentence for the offense with which they were charged. See *e. g.*, Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 281 F. 2d 943 (1960); Overholser v. O'Beirne, 112 U.S.App.D.C. 267, 302 F.2d 852 (1961).

6. We view our role here as being similar to that in habeas corpus proceedings. In habeas corpus proceedings, the appellate court can examine the record and, without remanding, reach a conclusion contrary to that reached below. See *e. g.*,

It is true that the juvenile court has "a substantial degree of discretion" in determining whether to retain jurisdiction over a child. Kent v. United States, 383 U.S. at 554, 86 S.Ct. 1045, 1054. But this discretion must be exercised in accordance with the spirit of the Juvenile Court Act. As the Supreme Court said in *Kent:*

> The theory of the District's Juvenile Court Act, like that of other jurisdictions, is rooted in social welfare philosopohy rather than in the corpus juris. Its proceedings are designated as civil rather than criminal. The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment. The State is *parens patriae* rather than prosecuting attorney.

Congress had made clear that the waiver provision (D.C.Code § 11–1553) is not excluded from this fundamental philosophy of *parens patriae.* D.C.Code § 16–2316 states:

> Sections 11–1551 to 11–1554 * * * shall be liberally construed so that, with respect to each child coming under the court's jurisdiction: * * * (3) when the child is removed from his own family, the court shall secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given him by his parents.

*Parens patriae* requires that the juvenile court do what is best for the child's care and rehabilitation so long as this disposition provides adequate protection for society.[7] In the instant case, no concern was shown for Kent's care and rehabilitation, and mechanisms by which society could be protected were ignored.

The juvenile authorities who waived Kent knew that he was seriously ill and in need of treatment.[8] The Government argues, however, that their decision to waive does not indicate a lack of concern for Kent's care and rehabilitation. It emphasizes that "if a waived juvenile is found not guilty by reason of insanity, the psychiatric facilities of the district court are, of course, at least as adequate as those available to the Juvenile Court. * * * * "[9] The argument is, at best, disingenuous. It overlooks the fundamental point that waiver is a judgment that an adult criminal prosecution should be instituted against the juvenile. The purpose of this exercise is to obtain a conviction for which the juvenile may be penalized as an adult. The exercise succeeded when the jury convicted Kent on several counts even though it recognized full well that he was suffering from a serious mental illness.

Treatment of a sick juvenile is not a concern of an adult criminal proceeding. Kent's case bears this out. Before trial the district court sent him to District of Columbia General Hospital and then to Saint Elizabeths Hospital for mental examinations, not treatment. Upon completion of these examinations on April 9, 1962, he spent eleven months in a

---

United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2d Cir.) cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143 (1963); Bailey v. Henslee, 287 F.2d 936 (8th Cir.) cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961).

7. The director of social work for the Juvenile Court testified below that "the Juvenile Court is obligated to deal with children who have violated the law and to arrive at a disposition wherever possible, which is in the best interest of the child and not inconsistent with the best

interest of the community as a whole. * * * "

8. The juvenile authorities had received a letter from a respected psychiatrist stating that Kent was "suffering from a severe psychopathological state. * * * " The judge who waived Kent noted that he "needs long-term close supervision and perhaps residential psychiatric treatment."

9. Brief for Appellee, p. 15.

prison prior to trial without any psychiatric attention.[10]

To all intents, psychiatric care was withheld from this schizophrenic juvenile for eighteen months from the date of his arrest while he was undergoing the trauma inherent in the incidents of a criminal prosecution. When he finally entered a hospital for treatment, a thirty to ninety year prison sentence loomed over him, undoubtedly impairing his chances of recovery.

It seems clear that the chief reason for waiver was that the juvenile court could retain jurisdiction over Kent for only five years and that he was unlikely to recover within this period. The paradoxical result is that the sicker a juvenile. is, the less care he receives from the juvenile court. Since it may not be possible to guarantee that a very sick adolescent will recover by the time he is twenty-one, he will invariably be subjected to all the strains and stresses of a criminal prosecution, with only the hope that the Government will not succeed in its effort and that he may ultimately receive treatment pursuant to D.C.Code § 24-301(d).[11]

Perhaps even this harsh result might be justified if there is no other way to protect society. But it is clear that society can be protected without departing from civilized standards for the prompt and adequate care of disturbed children. The juvenile court can institute civil commitment proceedings against the youngster. If commitment ensues, he will be confined and treated until he is no longer dangerous due to mental illness.[12] If not, the juvenile court will be free to follow its usual procedures.

■ Since waiver was not necessary for the protection of society and not con-

ducive to Kent's rehabilitation, its exercise in this case violated the social welfare philosophy of the Juvenile Court Act. Of course, this philosophy does not forbid all waivers. We only decide here that it does forbid waiver of a seriously ill juvenile.

IV

Since Morris Kent should not have been waived in 1961, the subsequent criminal proceedings were invalid and must be vacated. This does not mean, however, that he will be released from Saint Elizabeths Hospital. The Government can institute civil commitment proceedings against Kent to ensure that he remains in the Hospital. We think the institution of commitment proceedings is demanded by appellant's long history of serious illness accompanied by sordid behavior. Such proceedings will assure his confinement for treatment for as long as the public safety requires. And to avoid any gap in Kent's confinement, we stay our mandate in this case until the commitment proceedings have been completed, provided they are instituted within thirty days.[13]

We reverse the decision of the district court and direct it to vacate the prior judgment of the district court in accordance with this opinion.

Reversed.

BURGER, Circuit Judge (dissenting):

Appellant's convictions on three counts each of housebreaking and robbery, and verdicts of not guilty by reason of insanity on two counts of rape were affirmed by this court on appeal. Kent v. United States, 119 U.S.App.D.C. 378, 343 F.2d 247 (1964). Thereafter, "[b]ecause * * * the Juvenile Court's order waiving jurisdiction of petitioner

10. Long delays, especially in capital cases, are virtually inevitable. For this reason, the present director of social work for the juvenile court testified that he would not recommend waiver if the juvenile had mental problems because "we would consider this a more urgent consideration in the case and attempt to secure the necessary medical care."

11. If convicted, a person can obtain extensive psychiatric care only if the director of the Department of Corrections transfers him to a mental hospital. See D.C. Code § 24-302.

12. See D.C.Code §§ 21-546, 548.

13. See Barry v. Hall, 68 App.D.C. 350, 98 F. 2d 222 (1938).

was entered without compliance with" procedures newly announced by the Supreme Court it remanded the case to the District Court for the limited purpose of having that court re-evaluate the waiver made in 1961. Kent v. United States, 383 U.S. 541, 543, 86 S.Ct. 1045, 1048, 16 L.Ed.2d 84 (1966). The Supreme Court decided only that the philosophy of the juvenile court system made waiver from that court a critical stage in the proceedings and that "there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons." *Id.* at 554, 86 S.Ct. at 1053. The Supreme Court expressed no views whatever on the ultimate correctness of the waiver, nor did it give any indication that Appellant should not be punished criminally. The Court said: "We do not consider whether, on the merits, Kent should have been transferred; * * *." *Ibid.* The *sole* basis for the Supreme Court's holding was the lack of procedural regularity in not affording Appellant a formal adversary hearing on the question of waiver, accompanied by the right to counsel, access to social files of the Juvenile Court, and findings based on reasons.

At the remand hearing the District Court, constituted as a Juvenile Court pursuant to statutory power not challenged here, conducted a two-day evidentiary hearing and determined that Appellant's waiver to the District Court was

proper.[1] The majority now reverses that determination.

I do not agree that Appellant's case was improperly waived from the Juvenile Court to the District Court. Appellant's entire record, including not only the evidence in the District Court trial but also his own account of multiple rapes and robberies for which he was never criminally charged,[2] and his entire social and psychiatric file were known. This revealed, in findings not challenged, that the "child" with whom we are dealing was "on the verge of killing" when arrested; was charged with *three* capital offenses; had "engaged in extensive criminal activity characterized by aggressiveness and violence" while under the probationary supervision of the Juvenile Court for previous offenses,[3] had not responded to the efforts and facilities of the Juvenile Court; and was suffering from mental disorder for which the period of rehabilitation could reasonably be assumed to exceed the time limits of Juvenile Court jurisdiction.

The majority casually asserts that due to "defective findings" the District Court's decision cannot be sustained. Even assuming, as the majority contends, that the District Court was in error in some aspects of its findings, we should affirm if the result reached is correct; the law requires us to affirm unless the District Judge is "clearly erroneous." Review in this court of District Court findings which rest on observations of the accused, detailed judicial and social files, and vast amounts

---

1. The District Court on remand was to consider Kent's waiver *nunc pro tunc* in the circumstances of 1961. But in a *nunc pro tunc* reconsideration judges cannot close their eyes to the stubborn fact that in 1968 Kent is 23 years old. Turning the clock back in these circumstances is about as productive as trying to "unring the bell." Kent is not a juvenile but, on this record, it is uncontested that he is a dangerous person who has committed numerous grave crimes of violence. Can we assume that a juvenile court is equipped to deal with this kind of person?

2. The record reveals not only the charges for which he was eventually tried, but, within a time span of six months, *seven* separate incidents, each involving housebreaking, robbery and sexual assault.

3. Appellant's prior contact with the Juvenile Court was based on four housebreakings, two purse-snatchings and one Peeping Tom offense, all within a period of three years and some of which occurred while on probation for prior offenses.

of testimony, is not a contest of private opinion, or our sociological leanings versus those of others. Our review has a narrow scope and we are as much subject to the commands of statutes and rules as are all others.

The nature of the District Court's "defective findings" which the majority asserts are based on "erroneous assumptions and unwarranted speculations" is far from that. For instance, the majority attacks the District Court's fear that if civilly committed, Appellant would not be placed in the maximum security ward at St. Elizabeths Hospital. But the only assurance that he would be placed there if civilly committed is the majority's *own* assumptions and speculations. There is not a scintilla of evidence in this record to support the majority's freewheeling speculations that Kent would have been kept under maximum security. On the contrary, the evidence satisfied the District Court that the prevailing practice had been to place *civilly* committed patients in non-maximum security wards. The majority also refers to the finding that a person civilly committed to St. Elizabeths Hospital may be released by a doctor, without judicial order or review. This, of course, is neither an assumption nor a speculation —*it is the law.* 21 D.C.Code § 548 (1967). But the majority reads into the opinion of the District Court an implication that Kent might be negligently released while still dangerous. As I read the findings, the District Judge was simply showing a proper concern for the protection of the public and Kent. Nor did the District Court find, as the majority opinion states, that the Juvenile Court could not reinstate the charges. It concluded only that 1961 Juvenile Court practice was that civil commitment was not attempted until after termination of the case in the Juvenile Court.

The majority opinion asserts that the District Court turned "civil commitment law on its head" because it found that Kent's dangerousness was a factor to consider on the waiver issue. The majority view seems to be that if Kent

were potentially dangerous to himself or others he should have been *committed,* not tried, and that neither the District Court nor the Juvenile Court could assert jurisdiction over him. But the District Court was not called upon to determine whether or not Kent should be committed—in which case dangerousness would be a factor in favor of commitment. It was asked instead to determine whether the Juvenile Court or the District Court should have original jurisdiction over Kent. Unless we are to say that the District Court had no duty to protect the public from Kent and Kent from himself, the District Court plainly was correct in weighing his dangerousness and trying to discern what were the best "mechanisms by which society could be protected"—to borrow a phrase from Judge Bazelon. (Page 411).

I suggest that it is the majority who turn the law "on its head." The District Court had a narrow issue before it —if Kent were not to be waived, all the procedures of the Juvenile Court would take over, but if he were waived, he would be like any other person charged with a serious crime. In the District Court he could assert absence of criminal responsibility and this could lead him to treatment at St. Elizabeths Hospital after verdict. Alternatively, the District Court could constitute itself as a juvenile court and have broader facilities than available to the Juvenile Court itself. Judge McGowan, in his earlier opinion in this very case, noted that if waived Kent " 'will have in the District Court all the rights in relation to his alleged psychiatric problems that he would have in the Juvenile Court.' " Kent v. United States, 119 U.S.App.D.C. 378, 385, 343 F.2d 247, 254 (1964). Judge McGowan was there quoting what Judge Washington had said in yet another opinion relating to this appellant. Kent v. Reid, 114 U.S.App.D.C. 330, 333, 316 F.2d 331, 334 (1963). Judge McGowan further observed that "the District Court's range of opportunity in this respect exceeds that of the Juvenile Court

* * *." 119 U.S.App.D.C. at 385, 343 F.2d at 254.

The result of the approach of the majority is to re-constitute *this court* as the Juvenile Court and to reach a factual determination contrary to that already carefully worked out in the District Court sitting as a juvenile court. The Supreme Court could not have been more explicit about where waiver properly belongs: "the statute contemplates that the Juvenile Court should have considerable latitude within which to determine whether it should retain jurisdiction * * *. The statute gives the Juvenile Court a substantial degree of discretion as to the factual considerations to be evaluated, the weight to be given them and the conclusion to be reached." 383 U.S. at 552–553, 86 S.Ct. at 1053. The discretionary powers of the trier, so plainly underscored by the Supreme Court, are now cavalierly taken over by this court. There is no claim that the District Court employed the *wrong* standards for its re-appraisal of the waiver; indeed the prior opinion of this court gave express approval of the "waiver policy memorandum" and the Supreme Court did not disturb that holding. Perhaps the more serious fault of the majority holding is that it overrules the prior decisions of this court without even giving the reasons or alluding to what Judge McGowan said previously, much less requiring that the issues be submitted to the court sitting *en banc.* Judge McGowan wrote, when Kent's case was last here:

> The mental condition of a juvenile is obviously a relevant factor within the meaning of Policy Memorandum No. 7. We assume that the Juvenile Court here was well aware that there might be a question in appellant's case as to whether his mental condition justified the imposition of criminal responsibility upon him. But we do not consider that the Juvenile Court either can or must finally and definitely resolve this issue as a pre-condition to a valid waiver. Waiver does not fix criminal responsibility. As in this case, it simply leaves that to the tribunal normally charged with doing so —the District Court. *It is by no means clear, as appellant seems contrarily to assume, that the facilities presently available to the Juvenile Court for the diagnosis and treatment of mental disease are as adequate as they should be; or that, indeed, they approximate those serving the criminal law system.* A Juvenile Court judge, confronted with the possibility of mental disease, is hardly disabled from waiving solely by a concern that the relationship of that possibility to criminal responsibility may not be properly established in the District Court or, if no responsibility for this reason is ultimately found, that the defendant cannot thereafter be accorded proper treatment. * * * In any event, the District Court is equipped with both the authority and the facilities to explore the mental difficulties of defendants and to effect hospitalization in proper cases. We pointed this out expressly in appellant's earlier appeal, where we said that "*it seems unnecessary to note that the appellant will have in the District Court all the rights in relation to his alleged psychiatric problems that he would have in the Juvenile Court.*" Kent v. Reid, 114 U.S.App.D.C. at 333, 316 F.2d at 334. *Indeed, it can be urged that the District Court's range of opportunity in this respect exceeds that of the Juvenile Court, especially considering the limited time available for cure and rehabilitation under a Juvenile Court commitment.* * * *

119 U.S.App.D.C. at 385, 343 F.2d at 254 (emphasis added) (footnote omitted). By holding that a juvenile who has a mental disorder cannot be waived, the majority overrules the express statement of the law in the prior appeal of the present case.

As a result of the criminal proceedings in the District Court, Kent was placed in the maximum-security ward at St. Elizabeths Hospital. This was error, says the majority. He should have been

civilly committed and *then* placed in the maximum-security ward at St. Elizabeths Hospital. In other words, it shows a lack of proper regard for "Kent's care and rehabilitation" to have placed him precisely where the majority now vehemently argues he should be placed. So convinced is the majority that Kent belongs in the precise facility where he has been sent that it has now determined to keep him there on its own motion— completely without statutory authority or any "due process"—even while invalidating his commitment to St. Elizabeths by the District Court.

The majority's mandate is stayed only until civil commitment proceedings are *commenced.* Should Kent be found not to be civilly committable, then it would appear that he should go free, notwithstanding the majority assurance that Kent can be held under maximum security.[4]

---

4. The basic fallacy of relying on civil commitment procedures to deal with criminal conduct is that civil commitment was not designed for that purpose. The equal protection claim is not a valid one; persons for whom civil commitment statutes were designed are not persons who have committed robbery, rape or murder. Convicted felons are not entitled to precisely the same processes as senile old people. Lawmakers in recent years have been sensitive to the need to make civil commitment difficult, recognizing the dangers of relatives "farming" out their kindred into mental institutions for motives not always worthy.